UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACP, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>SKYPATROL, LLC, et al.,<br><br>    Defendants. | Case No. 13-cv-01572-PJH<br><br>**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 136, 142, 148 |

The parties' cross motions for summary judgment came on for hearing before this court on April 26, 2017. Plaintiff ACP, Inc. ("ACP") appeared through its counsel, Robert Freitas and Rachel Kinney. Defendant Skypatrol, LLC ("Skypatrol") appeared through its counsel, Paul Schwiep. Defendant Gordon Howard Associates, Inc. ("Gordon Howard"), doing business as PassTime USA, appeared through its counsel, David Makman. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, the court hereby rules as follows.

## BACKGROUND

**A.    Procedural History**

This dispute arises out of negotiations in late 2011 and early 2012 between ACP, Skypatrol, and Gordon Howard. The contemplated deal was an investment by ACP in Skypatrol and Gordon Howard (collectively "defendants"), with ACP investing up to $45 million and combining the two companies. The initial negotiations culminated in a January 7, 2012 letter called an "indication of interest" (the "IOI"), which is on ACP letterhead and signed by representatives from Skypatrol and Gordon Howard. The court has described the IOI as follows:

> The [IOI] is a letter titled "Potential Acquisition of Skypatrol, LLC and PassTime" written by ACP, addressed to Gene Ramirez, and dated January 7, 2012. Dkt. 6, Ex. A. Both Skypatrol and Gordon Howard signed the letter, indicating that its terms were "jointly and severally accepted and agreed." Id. at 7. As the title suggests, the letter reflects ACP's interest in acquiring the defendants (which are referred to collectively as "the

> Companies" in the letter). See id. In the introduction, ACP lays out its strengths and experience, seemingly to persuade Skypatrol and Gordon Howard of its ability to lead financially and strategically. Id. at 2. Then, the letter lays out the "key terms of the proposed transaction", stating that "we [ACP] are excited by the opportunity to move forward in this process under the terms outlined below." Id. The final paragraph of the letter states that "this letter agreement is an expression of mutual intent only and is non-binding, except for the terms related to Exclusivity and Expenses, which will be binding." Id. at 5. . . . The Expenses provision states that "[t]he Companies shall reimburse [ACP] for its actual out-of-pocket expenses incurred in pursuit of the Transaction." Id. at 7.

Dkt. 34 at 2. The contemplated deal fell apart, and ACP brought a complaint on April 8, 2013, seeking its "out-of-pocket expenses." Dkt. 1.

On July 31, 2013, the court dismissed ACP's claim for breach of contract against Skypatrol and Gordon Howard because the IOI was not a binding contract. Dkt. 34, 41. The court found that the IOI was not an enforceable unilateral contract because ACP was the offeror. Dkt. 34 at 7. No bilateral contract was formed because ACP provided no consideration. Id. at 8. Leave to amend to add a promissory estoppel claim was denied as futile. Id. at 9–10.

On appeal, the Ninth Circuit affirmed in part and reversed in part on May 6, 2016. Dkt. 48. Judge McKeown, writing for the majority, affirmed dismissal of the contract claim because "ACP was the promisor under the letter agreement." Id. at 2. ACP's performance therefore could not create a unilateral contract. Id. at 3. However, the majority found that leave to amend to plead promissory estoppel was not futile and should have been granted "[g]iven the liberal rules of amendment." Id. The majority noted that "the unamended complaint already comes close to pleading the necessary elements," and that "ACP's complaint sufficiently alleged a 'clear and unambiguous' promise and that ACP was injured by its reliance on that promise." Id. at 4.

Judge Rawlinson, dissenting in part, would have affirmed in all respects. In her view, leave to amend to add a claim for promissory estoppel would be futile because ACP "was the promisor," not the promisee. Dkt. 49. Judge Parker, dissenting in part, would have reversed as to both claims because "the fact that transaction was proposed

by ACP does not mean that ACP was the promisor." Dkt. 50. ACP may have been the offeror, but it was not the promisor. Id. at 4. On the contrary, the IOI contains a clear promise by the defendants. Id. at 5. In Judge Parker's view, both the unilateral contract and promissory estoppel theories were viable.

**B.     The Pleadings' Allegations**

Following remand, ACP filed the operative first amended complaint ("FAC"), asserting a single cause of action for promissory estoppel. Dkt. 68. ACP's claim is based on the IOI's "Expenses" provision, which states that defendants "shall reimburse [ACP] for its actual out-of-pocket expenses incurred in pursuit of the Transaction," up to $500,000. FAC ¶¶ 8–9; Dkt. 6-1 at 5. ACP alleges that it reasonably relied on this promise to investigate the transaction, incurred expenses in doing so, and was not reimbursed by defendants. FAC ¶¶ 10–11.

The defendants answered, with Gordon Howard counterclaiming for promissory fraud and promissory estoppel, and Skypatrol counterclaiming for fraud. Dkt. 72, 91.

Gordon Howard's counterclaims are made against both ACP and Christopher Nicholson, the "lead negotiator" for ACP. Dkt. 72 ¶¶ 3, 25–31. Gordon Howard alleges that in a meeting "on or about December 12, 2011," its CEO Stan Schwarz "explicitly advised" Nicholson that Gordon Howard would "only be interested" in a deal if its "existing leadership team would stay intact . . . for at least two to three years." Id. ¶ 12. In response, Nicholson "assured" Schwarz that any deal "would include these protections." Id. Nicholson further agreed that, in the contemplated deal, Gordon Howard would only license (not transfer) its patents to the new entity, and that ACP "would have to purchase more than 50 percent of the common stock" if it wanted control of the new entity. Id. ¶¶ 13–14. However, when ACP provided its detailed proposal in March 2012, Schwarz was "stunned" to learn that ACP's proposed deal did not include the agreed-upon protections for Gordon Howard's leadership, that ACP wanted full control without making the required investment, and that ACP wanted Gordon Howard to assign all of its patents. Id. ¶ 19. Moreover, Nicholson, in an effort to "brow beat" Gordon Howard into accepting

3

the deal, demanded $1.1 million in alleged out-of-pocket expenses. Id. ¶ 20. Based on these allegations, Gordon Howard asserts claims for promissory fraud and promissory estoppel, on the theory it relied on ACP's false representations when it signed the IOI and entered into an expensive investigation of the transaction.

Skypatrol's fraud counterclaim is asserted only against ACP. Dkt. 91 ¶ 27. In the December 2011 meeting, Skypatrol, through its CEO Robert Rubin, concurred in the concerns that Schwarz voiced about maintaining key management following the proposed merger. Id. ¶ 9. These concerns were expressed to Nicholson and ACP's Managing Director Keoni Schwartz, who "agreed" to provide long-term employment contracts to key employees. Id. Schwartz and Nicholson represented that if ACP did not purchase more than 50% of the stock in the combined entity, ACP would not demand control of the combined company. Id. ¶ 10. When the detailed proposal was unveiled in 2012, Rubin was "shocked" that ACP demanded a controlling interest in the combined company without acquiring more than 50% of the stock, and that ACP had "reneged" on its commitment to protect the key leadership of Gordon Howard and Skypatrol. Id. ¶ 16. ACP followed with a $1.1 million demand for expenses in an effort to "coerce" Skypatrol into accepting the deal. Id. ¶¶ 18–19. Based on these allegations, Skypatrol asserts a counterclaim for fraud on the theory that it reasonably relied on ACP's intentionally false representations when it signed the IOI and incurred expenses in investigating the deal. Id. ¶¶ 22–23, 29–31.

**C.    The Factual Record**

As discussed in more detail below, many of the material facts in this case are disputed. The record developed in discovery, however, reveals the following facts, which are undisputed unless otherwise noted.

On September 8, 2011, Robert Rubin, the CEO of Skypatrol, sent a letter of intent ("LOI") to Stan Schwarz, who was then the CEO of Gordon Howard. See Makman Decl. Ex. B; Rubin Dep. 59:19–60:16. The letter contemplates a potential "combination" of Skypatrol and Gordon Howard. Makman Decl. Ex. B at 1. The two companies

developed a business plan whereby Skypatrol and Gordon Howard would merge and potentially acquire other companies. Rubin Dep. 62:12–16; Nicholson Decl. ¶ 4.

To further this plan, Skypatrol and Gordon Howard sought an investor. Skypatrol and Gordon Howard's initial contact with ACP was facilitated by Gene Ramirez, an investment banker, in November 2011. Nicholson Decl. ¶ 4; Schwarz Decl. ¶ 7. ACP is part of a private equity organization called "Altamont Capital Partners," which consists of "dozens of entities," including ACP, Inc. Schwartz Dep. 17:7–20, 129:11–14.

On December 12, 2011, Skypatrol and Gordon Howard presented their plan for a proposed combination to ACP's representative, Chris Nicholson. Nicholson Decl. ¶ 5; Rubin Decl. ¶ 2; Schwarz Decl. ¶ 7. Nicholson is not an employee of ACP, but a consultant that is "associated" with Altamont Capital Partners and works for them as an independent contractor. Nicholson Dep. 18:2–8, 19:23–20:2. For his work, Nicholson is compensated with a monthly retainer and a contingent percentage of any deals that he procures for Altamont Capital Partners. Id.; Makman Decl. Ex. D. Schwarz, Rubin, Schwartz, and Nicholson were present at the December 2011 meeting. Schwarz Decl. ¶ 7; Nicholson Decl. ¶¶ 5–6; Rubin Decl. ¶ 2; Nicholson Dep. 35:19–36:6.

The parties strongly dispute much of what occurred at the December 2011 meeting (as well as in other contemporaneous oral discussions). Defendants allege that, at the December 2011 meeting and prior to their signing of the IOI, Nicholson made a number of promises to the effect that any final deal would include certain provisions. In particular, Schwarz and Rubin testified that Nicholson promised that Rubin and Schwarz would be the "management team" of the new company, and that they would have three-year employment contracts. Rubin Dep. 123:1–124:20; Rubin Decl. ¶¶ 5, 10–12; Schwarz Dep. 9:2–19; Schwarz Decl. ¶¶ 11, 16. Schwarz further avers that Nicholson agreed that the deal would not require a transfer of certain Gordon Howard patents. Schwarz Decl. ¶ 21. Nicholson, however, categorically denies making any such representations. Nicholson Decl. ¶¶ 7–8.

On or about January 7, 2012, Gordon Howard and Skypatrol signed the IOI, which is described above. The IOI is on ACP letterhead, addressed to Gene Ramirez, and signed by Schwartz, Rubin, and Schwarz. See Dkt. 6-1 at 2, 6–7. The IOI was initially drafted by ACP, see Nicholson Decl. ¶¶ 10–14, but some of its provisions were negotiated; in particular, the Expenses provision and its $500,000 cap were negotiated. See Rubin Dep. 77:6–16; Nicholson Decl. Ex. B; Kinney Opp'n Decl. Ex. 6.

The IOI states that it is "an expression of mutual intent only and is non-binding, except for the terms related to Exclusivity and Expenses, which will be binding." Dkt. 6-1 at 5. Two provisions of the IOI are relevant to the instant motions. The first is the Expenses provision, which states that "[Defendants] shall reimburse Altamont for its actual out-of-pocket expenses incurred in pursuit of the Transaction." Id. "Altamont" is defined to mean "ACP, Inc.", the plaintiff in this case. Id. at 2. The "Transaction" refers to the contemplated deal through which ACP would purchase a stake in Skypatrol and Gordon Howard. Id.

The second provision relevant here is the "Other control" provision, which states:

> If, prior to closing, the parties agree to documents and terms that would result in ACP not acquiring more than 50% of the outstanding voting stock, then the parties would negotiate in good faith to put in place a package of affirmative and negative covenants to share control in a mutually acceptable manner.

Id. at 3.

In March and April 2012, the deal fell apart. On March 21, 2012, Schwarz informed Nicholson that in light of "large philosophical differences of opinion," Schwarz believed that it was "best to hold off" on the deal. Rubin Decl. Ex. B at 6; Nicholson Decl. ¶ 17. Based on contemporaneous emails exchanged between the parties, the sticking points included: (1) whether Gordon Howard would retain or transfer certain patents as part of the deal, see Makman Decl. Ex. OO (March 14, 2012 email discussing the "impasse we are experiencing with the Patent portfolio"); and (2) whether Rubin and Schwarz would remain as the management of the combined entity long-term, see Rubin

Decl. ¶ 15; Makman Decl. Ex. BBB (March 18, 2012 email from Gene Ramirez reporting that Schwarz objected to "the removal or replacement of Robert Rubin or Stan Schwarz" during 2012); see also Rubin Dep. 35:1–17. On April 1, 2012, Schwarz emailed Nicholson to inform him that after "extensive discussions . . . we are going to pass on this transaction." Nicholson Decl. Ex. E at 2.

The parties characterize how the deal unraveled differently, based on the disputed facts surrounding the December 2011 meeting. Defendants blame the failure of the deal on ACP's alleged "bait-and-switch," characterizing it as a result of ACP proposing terms that were inconsistent with its earlier representations. ACP denies this, and characterizes the deal's failure as an ordinary breakdown in the negotiation of open issues. ACP argues that any alleged "changes" in the deal reflect issues that emerged during its due diligence process.

On April 2, 2017, in response to Schwarz's email that Gordon Howard would "pass" on the transaction, Nicholson wrote to Schwarz seeking "all of my out-of-pocket expenses, which total approximately $1.1M." Makman Decl. Ex. K. On August 13, 2012, Nicholson wrote a letter to Schwarz and Rubin to "demand reimbursement of our expenses (totaling $1,134,658)." Makman Decl. Ex. L. The August 13, 2012 letter summarizes the following due diligence expenses allegedly incurred by ACP:

- $398,850 from PricewaterhouseCoopers LLP ("PwC");
- $345,000 from Bain & Company, Inc. ("Bain");
- $292,118 from Ropes & Gray LLP ("Ropes & Gray");
- $37,451 in "Travel / Lodging / Meals / Misc" ("Misc" expenses);
- $31,000 from the PL Investigative Group" ("PL IG");
- $30,149 from McGlinchey Stafford, PLLC ("McGlinchey").

Id. In this litigation, however, ACP only seeks expenses up to the IOI's $500,000 cap, and does not rely on the invoice from Bain or the "Misc" expenses. See ACP Opp'n at 13–18; Dkt. 173, Hearing Tr. 14:22–15:2.

///

7

**DISCUSSION**

**A. Legal Standard**

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105–06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324–25 (moving party can prevail merely by pointing to an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material: the existence of

only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247–48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011). In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." ACLU of Nevada v. City of Las Vegas, 466 F.3d 784, 790–91 (9th Cir. 2006) (citations omitted).

If a party makes a showing "that there is no genuine issue of material fact as to particular claim(s) or defense(s), the court may grant summary judgment in the party's favor 'upon all or part thereof.'" Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial § 14:33 (2008). "This procedure is commonly referred to as a 'partial summary judgment.'" Id. § 14:34.

**B. Analysis**

Three dispositive motions are before the court, one by defendants and two by ACP. Defendants move for summary judgment in their favor on ACP's promissory estoppel claim. Dkt. 136. ACP's first motion seeks summary judgment in its favor on its own estoppel claim, as well as on Skypatrol's fraud counterclaim. Dkt. 142. ACP's second motion seeks summary judgment in its favor on Gordon Howard's counterclaims. Dkt. 148.

Because there is substantial overlap and repetition in the parties' arguments in their cross motions for summary judgment, the court will analyze the issues on a claim-by-claim (as opposed to a motion-by-motion) basis.[1]

---

[1] In conjunction with their motions, the parties have filed six motions to file under seal. See Dkt. 137, 147, 149, 156, 159, 162. As these relate to dispositive motions, the heightened "compelling reasons" standard for sealing applies. Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006). For the reasons stated on the record at the record at the April 26, 2017 hearing, all of the sealing motions are DENIED.

### 1. ACP's Promissory Estoppel Claim

Both parties have moved for summary judgment on ACP's promissory estoppel claim. The elements of promissory estoppel are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [that is] both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." Aceves v. U.S. Bank, N.A., 192 Cal. App. 4th 218, 225 (2011) (citation omitted). The court finds that there is a genuine factual dispute regarding the injury element that precludes summary judgment in favor of either party on this claim.

The court will address defendants' motion for summary judgment first. Defendants put forth two bases for summary judgment in their favor on ACP's claim, one legal and one primarily factual. First, defendants argue that they did not make any "clear and unambiguous promise" to ACP because ACP was the promisor in the IOI. Second, assuming that the Expenses provision is enforceable, defendants argue that ACP has not submitted any evidence that it actually paid any "out-pocket expenses" because all of the expenses were paid by entities other than ACP, Inc.

Defendants' first basis for summary judgment attempts to reargue legal issues already decided by the Ninth Circuit. Defendants argue that ACP cannot make a claim for promissory estoppel because the Ninth Circuit majority held, when discussing ACP's contract claim, that "ACP was the promisor under the [IOI]." Dkt. 48 at 2. However, defendants' argument ignores the Ninth Circuit's express holding that ACP "sufficiently alleged a 'clear and unambiguous' promise [in the IOI] and that ACP was injured by its reliance on that promise." Dkt. 48 at 4. This holding was specifically directed to the promissory estoppel claim, and is binding on this court. Thus, as the Ninth Circuit held, the IOI contains a promise by defendants that they would "reimburse [ACP] for its actual out-of-pocket expenses." Dkt. 6-1 at 6–7. Defendants' legal argument therefore provides no basis for summary judgment.

Defendants' second basis for summary judgment goes to the injury element of ACP's promissory estoppel claim. Defendants argue that there is no evidence that ACP

10

incurred any "actual out-of-pocket expenses" because all of its expenses were invoiced to and/or paid by third parties. The court finds that factual disputes preclude summary judgment on this issue.

Defendants argue that summary judgment in their favor is appropriate because none of the alleged expenses were actually paid by ACP, Inc., as opposed to other entities that are part of the "Altamont Capital Partners" group. Even resolving all factual disputes in ACP's favor for purposes of defendants' motion, defendants are correct that none of the invoices were paid directly by ACP itself. See ACP Opp'n at 13–18 (conceding this point). Specifically, the PwC invoice was purportedly paid by ACP Tacala Investment Holdings L.P. and ACP Boom Investment Holdings L.P. Makman Decl. Ex. P; Nicholson 30(b)(6) Dep. 106:14–15 (errata). The Ropes & Gray invoice was purportedly paid by ACP Burleigh Holdings, LLP. Kinney Opp'n Decl. Ex. 5; Makman Dep. Ex. V, W. The McGlinchey invoice was purportedly paid by Altamont Capital Partners LLC. Kinney Decl. Ex. 11; Makman Decl. Ex. AA. The PL IG invoice was purportedly paid by Altamont Capital Management LLC. Kinney Decl. Ex. 12; Makman Decl. Ex. Q. Plaintiff acknowledges that all of the entities who paid the bills (collectively, the "payor entities") are distinct from ACP, Inc. Schwartz Dep. 79:20–80:1, 127:10–25, 131:13–132:3; Nicholson 30(b)(6) Dep. 105:19–106:17.

In the Expenses provision, defendants promised to "reimburse [ACP] for its actual out-of-pocket expenses incurred in pursuit of the Transaction." "Out-of-pocket expenses" is not defined in the IOI. However, the term usually means that the expense must be paid out of one's own funds, as opposed to expenses paid by some other entity. See, e.g., Oxford University Press, Oxford Living Dictionary, Out of Pocket, https://en.oxforddictionaries.com/definition/out_of_pocket ("paid for directly rather than being put on account or charged to some other person or organization"); Merriam-Webster Dictionary, Out-of-Pocket, https://www.merriam-webster.com/dictionary/out-of-pocket ("paid for with your own money rather than with money from another source (such as the company you work for or an insurance company)").

11

ACP argues that the fact that the expenses were paid by "agents" of ACP—i.e., other affiliated companies that are part of the "Altamont Capital Partners" group—is of no consequence. If the payor entities were acting as agents of ACP, then their payment could be attributed to ACP because in "an agency relationship, the agent's acts are regarded as the acts of the principal." Channel Lumber Co. v. Porter Simon, 78 Cal. App. 4th 1222, 1231 (2000).

However, it is not clear that the payor entities were, in fact, acting as agents of ACP. Defendants argue that ACP has produced "no evidence" that the payor entities were agents of ACP, that ACP reimbursed its alleged agents, or even that ACP was liable to reimburse the alleged agents. Although an agency relationship may be "informally created," Housewright v. Pac. Far E. Line, Inc., 229 Cal. App. 2d 259, 265 (1964), it still requires evidence that ACP had the "right to control" the payor entities. See Meyer v. Holley, 537 U.S. 280, 286 (2003). On the evidence submitted, the actual relationship between ACP and the payor entities in these transactions is unclear. However, the court finds that the declaration of Keoni Schwartz creates a triable issue of fact on the agency issue. Schwartz declares that he is a Managing Director of ACP, Inc., and that he "authorized" both the PwC and Ropes & Gray invoices to be paid and that each invoice "has been paid." Schwartz Decl. ¶¶ 5–7. Schwartz further declares that the work done by PwC and Ropes & Gray was "work performed for ACP on the Skypatrol/Gordon Howard deal." Id. Summary judgment in defendants' favor is therefore inappropriate because ACP has presented evidence from which a reasonable factfinder could conclude that the payor entities were acting as ACP's agents when the paid they invoices at issue.

In summary, defendants' first basis for summary judgment is precluded by the Ninth Circuit's ruling in this case. Defendants' second basis for summary judgment fails because there are triable issues of fact as to whether ACP incurred "out-of-pocket" expenses. The court therefore DENIES defendants' motion for summary judgment.

///

ACP's motion for summary judgment in its favor on its promissory estoppel claim must be DENIED as well, for the same reasons that summary judgment in favor of defendants is inappropriate. As explained above, there is a material factual dispute over whether ACP has any "out-of-pocket expenses" because the bills were not paid directly by ACP, but instead by its alleged agents. Evidence of agency is limited and contested, however, creating a triable issue of fact on the agency issue. Moreover, defendants have also raised factual questions about the invoices relied on by ACP to prove its expenses, noting that the invoices (with one disputed exception) are directed to parties other than ACP. See, e.g., Makman Decl. Exs. P, V, Q, CC. This raises a further dispute of fact as to whether the expenses relied on by ACP were actually "incurred" by ACP "in pursuit of the Transaction." At trial, ACP will be required to prove both that it "incurred" the expenses in pursuit of the transaction at issue, and that these expenses were paid "out-of-pocket" by ACP or its agents. Given the contested evidence submitted, the court cannot decide either of those issues on summary judgment.

### 2. Skypatrol's Fraud Counterclaim

ACP's first motion seeks summary judgment on Skypatrol's counterclaim. Skypatrol's answer alleges "fraud" by ACP, but Skypatrol has clarified that its counterclaim sounds in promissory fraud, which is a "subspecies" of fraud. Newalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 973–74 (1997). The elements of promissory fraud are: "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promisee." Bennie v. State Farm Gen. Ins. Co., 196 Cal. App. 4th 1443, 1453 (2011).

Skypatrol's amended answer alleges two promises by ACP that form the basis of the promissory fraud counterclaim: (1) that any final deal would protect key members of Skypatrol's management, particularly Rubin, with long-term employment contracts (the

13

"employment agreement" promise); and (2) that ACP would not seek a controlling interest in the new company unless ACP purchased more than 50% of the company's stock (the "control" promise). Dkt. 91 ¶¶ 9–10, 27. However, Skypatrol did not make any argument about the "control" promise in its opposition brief, and at the hearing, Skypatrol stated that its counterclaim is based only on the "employment agreement" promise. Dkt. 173, Hearing Tr. 37:24–38:4. The court therefore GRANTS ACP's first motion for summary judgment in part, but only as to the "control" promise. For the reasons explained below, the court DENIES ACP's motion for summary judgment on Skypatrol's counterclaim in all other respects.

ACP's motion argues that Skypatrol has not presented evidence that creates triable issues as to the false promise, reasonable reliance, and intent elements. The court finds that there are genuine factual disputes on each of these elements.

As to the promise element, there is clearly a genuine dispute of fact as to whether a false promise was made by ACP to Skypatrol prior to the signing of the IOI. Rubin testified that Nicholson promised that Rubin and Schwarz would be the "management team" of the new company, and that Rubin would have a "three-year [employment] contract." Rubin Dep. 123:1–124:20; Rubin Decl. ¶¶ 5, 10–12. Schwarz's testimony[2] accords with Rubin's account. Schwarz Dep. 9:2–19; Schwarz Decl. ¶¶ 11, 16. Nicholson, on the other hand, denies making any such promises. Nicholson Decl. ¶ 7. This is a paradigmatic factual dispute that cannot be resolved via summary judgment. ACP argues that the alleged promises regarding employment protections for Rubin and Schwarz are "implausible" and "obviously false" in light of the circumstances. However, this amounts to an attack on the credibility of Rubin's and Schwarz's testimony—an issue that the jury must decide.

ACP's argument on the "reasonable reliance" element suffers from the same flaw. ACP argues that "common sense" would compel any reasonable factfinder to conclude

---

[2] ACP objects to Schwarz's testimony, but provides no reason why the court should not consider his declaration on summary judgment. See Fed. R. Civ. P. 54(c)(4).

14

1 that Skypatrol's reliance on oral promises made in an initial meeting was unreasonable.
2 In ACP's view, because the alleged promise was never memorialized in writing and was
3 made early on in the negotiations, a sophisticated party like Rubin would not rely on it.
4 However, at summary judgment, the court must draw all reasonable inferences in favor of
5 Skypatrol, the non-movant. See Anderson, 477 U.S. at 255.

In a fraud claim, the reasonableness of the reliance is typically a question of fact. See Guido v. Koopmans, 1 Cal. App. 4th 837, 843 (1991). Although ACP's arguments about the circumstances surrounding the alleged promises may be used at trial to undermine Rubin's credibility, they do not provide a basis for summary judgment in ACP's favor. Rubin has testified that he relied on the alleged promise, and that Skypatrol would not have signed the IOI had Nicholson not promised to provide "long-term employment contracts." Rubin Decl. ¶¶ 12–13. Rubin explained that the transaction was premised on the idea that Rubin and Schwarz would be the management team after the merger. Rubin Decl. ¶¶ 12–13; Rubin Dep. 123:6–124:5, 125:10–23. Because the proposed transaction "was not an acquisition," Rubin and Schwartz were not cashing out their shares and expected to continue on in their positions. Rubin Dep. 123:6–124:5. A factfinder could credit this testimony.

Although ACP makes much of the fact that there is no explicit mention of employment protections for Rubin and Schwarz in the written IOI, this is does not establish that Skypatrol's alleged reliance was unreasonable as a matter of law. The IOI does not purport to be a complete integrated contract, only an "outline[]" of "key terms" of the transaction. Dkt. 6-1 at 2. Rubin testified that it would be "unusual" to put terms regarding specific employment agreements in an IOI. Rubin Dep. 121:23–24. Moreover, there is no provision in the IOI that is directly contrary to the alleged oral "employment agreement" promise.

In short, although the oral nature of the promise, its timing, and Rubin's sophistication are certainly relevant to the reliance element, there is evidence from which a factfinder could conclude that reliance was reasonable.

Finally, ACP challenges the intent element. Again, the court finds that defendants have submitted evidence from which a reasonable factfinder could infer that the promise was made without an intent to perform. In California, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." Tenzer v. Superscope, Inc., 39 Cal. 3d 18, 30 (1985). As evidence supporting fraudulent intent, Skypatrol points to the $1.1 million expense demand (which was beyond the IOI's $500,000 cap), the fact that Nicholson allegedly had an undisclosed financial stake in the deal, and circumstantial evidence from internal ACP emails. See Rubin Decl. Ex. B, D.

Skypatrol uses these emails to argue that ACP had internally concluded that it wished to terminate employees of Gordon Howard, contrary to its alleged earlier promise. For example, Skypatrol points to a March 21, 2012 email chain among Nicholson, Schwartz, and others with the subject line, "End of the day [Skypatrol]/[PassTime] update". See Rubin Decl. Ex. B. In the email, Nicholson argues that, to save the deal, ACP ought to "(i) wait for Stan to calm down; (ii) cave a bit on the patent issue; and (iii) bribe him a bit with a severance package. Then we hit him with the 'Bob is boss,' 'Scap is Crap' and 'Alan is an Alien' concepts (and implications)." Id. at 4. Skypatrol argues that this email shows that ACP had concluded internally that it wished to terminate the Gordon Howard employees referenced, contrary to its prior promise to allow key management to remain, which is at least consistent with an intent not to perform the promise at the time it was made.

For its part, ACP construes these emails as reflecting a change of mind due to issues that arose during due diligence. Although the emails are certainly subject to differing interpretations, drawing all justifiable inferences in favor of Skypatrol, the court finds that there is sufficient evidence from which a trier of fact could find an intent not to perform the alleged promises. The court therefore DENIES ACP's first motion for summary judgment, except as to the "control" promise no longer relied on by Skypatrol.

///

///

### 3. Gordon Howard's Fraud and Promissory Estoppel Counterclaims

Separately, ACP has moved for summary judgment on Gordon Howard's counterclaims for promissory fraud and promissory estoppel. As explained above, the elements of promissory fraud are: "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promisee." Bennie, 196 Cal. App. 4th at 1453. The elements of promissory estoppel are: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [that is] both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." Aceves, 192 Cal. App. 4th at 225.

ACP's argument for summary judgment on Gordon Howard's promissory fraud counterclaim is very similar to its argument with respect to Skypatrol's counterclaim. ACP argues that the alleged promises were not "clear and unambiguous," that any reliance by Gordon Howard was unreasonable, and that Gordon Howard's evidence of fraudulent intent is insufficient.

Gordon Howard relies on three promises: (1) protections for Gordon Howard's management team, particularly Schwarz (the "employment agreement" promise); (2) that Gordon Howard would only license, not transfer, its patents to the new entity (the "patent" promise); and (3) that ACP would have to purchase more than 50% of the stock if it wanted a controlling interest in the combined entity (the "control" promise). Dkt. 72 ¶¶ 12–14, 26. The first promise is somewhat vague as alleged, but defendants clarified that the specific promise was a long-term (i.e., two- or three-year) employment contract for Schwarz, as well as Rubin. Schwarz Dep. 9:2–19; Schwarz Decl. ¶¶ 11, 16; accord Rubin Dep. 123:1–124:20; Rubin Decl. ¶¶ 5, 10–12. This promise is sufficiently clear. ACP also claims that it is unclear what patents were covered by the second promise, but the fact that some PassTime patents were held by a different entity does not make the

17

promise ambiguous. In the negotiations, all parties appear to understand which patents are at issue. See Makman Decl. Ex. OO. The third promise is also unambiguous: "control" simply means a majority of the Board. ACP's challenge to the clarity of the promises thus fails.

As discussed above, there is a genuine dispute of material fact as to whether the alleged promises were made. Rubin and Schwarz aver that the promises were made. Nicholson denies it. A factfinder must resolve this credibility dispute.

Turing to reliance, ACP argues that "no one" would reasonably rely on oral promises in initial negotiations. For the same reasons explained above with respect to Skypatrol's counterclaim, ACP's reliance argument misapplies the summary judgment standard. Schwarz testified that he relied on the promises, which he believed were "consistent" with the IOI, and that he would not have signed the IOI otherwise. Schwarz Decl. ¶¶ 27, 29–30. Neither the timing of the alleged promises, nor the fact that they were oral, establishes that Gordon Howard's reliance was unreasonable as a matter of law, drawing all justifiable inferences in Gordon Howard's favor. Accordingly, the court finds that whether reliance was reasonable as to the "employment agreement" and "patent" promises is a disputed factual issue.

However, ACP's reliance argument has merit with respect to the alleged "control" promise. The IOI has specific language addressing this issue, stating that if "the parties agree to documents and terms that would result in ACP not acquiring more than 50% of the outstanding voting stock, then the parties would negotiate in good faith to put in place a package of affirmative and negative covenants to share control in a mutually acceptable manner." Dkt. 6-1 at 3 (emphasis added).

Thus, the IOI promises only that control of the combined company would be negotiated "in good faith" if ACP chose to acquire less than 50% of the stock. California courts have held that reliance "is simply not justifiable" when the alleged oral representations "contradict" an integrated written agreement. Slivinsky v. Watkins-Johnson Co., 221 Cal. App. 3d 799, 807 (1990); L'Garde, Inc. v. Raytheon Space &

18

Airborne Sys., No. CV 11-4592-GW(AGRX), 2013 WL 12113998, at *17–*18 (C.D. Cal. Sept. 6, 2013) (collecting cases). Because there is specific language on the "control" issue in the IOI, combined with the context that ACP identifies, the court finds that no reasonable factfinder could conclude that Gordon Howard justifiably relied on the "control" promise. ACP's second motion for summary judgment is therefore GRANTED IN PART, only with respect to the "control" promise.[3]

This leaves the matter of ACP's intent not to perform the alleged "employment agreement" and "patent" promises. ACP argues that Gordon Howard's evidence of intent is insufficient. Like Skypatrol, Gordon Howard relies on ACP's nonperformance, the "inflated" $1.1 million expenses demand, and internal ACP emails as circumstantial evidence tending to show fraudulent intent. For example, Gordon Howard points to a February 22, 2012 email chain in which Nicholson requested a meeting with Rubin to "get your candid thoughts on the post-deal management team." Makman Decl. Ex. NN. Only weeks later, Nicholson revealed that ACP contemplated the "removal or replacement" of Schwarz within 9 months after the merger. Makman Decl. Ex. BBB. As to patents, Nicholson announced that "Stan is caving on patents" in February 2012 and by March was seeking "ALL" of the patents. Makman Decl. Exs. OO, QQ. Gordon Howard claims that these documents support its "bait-and-switch" narrative, arguing that the emails tend to show that ACP intended all along to change the deal to require transfer of patents and to terminate Gordon Howard's management, despite its earlier representations.

Of course, it is also very possible that ACP simply changed its mind on these issues, due to issues that arose during diligence or otherwise, or that ACP was merely trying to extract the most advantageous deal possible through aggressive bargaining. However, Gordon Howard need only show that there is a disputed issue of material fact

---

[3] Similarly, although Schwarz testified that he was also promised that ACP would invest the "full $45 million," Schwarz Decl. ¶ 28, this topic is covered by the express terms of the IOI which states that investment would be "up to $45 million." Dkt. 6-1 at 2 (emphasis added).

19

regarding the intent element in order to avoid summary judgment. When combined with the $1.1 million expense demand, Nicholson's allegedly undisclosed personal financial stake in the deal, and Skypatrol's intent evidence, the court finds that Gordon Howard has submitted sufficient evidence from which a factfinder could infer the requisite intent. The court therefore DENIES ACP's motion for summary judgment as to Gordon Howard's promissory fraud counterclaim, except as to the "control" promise.

ACP's motion for summary judgment as to Gordon Howard's promissory estoppel counterclaim is DENIED for all the same reasons that its motion with respect to the promissory fraud claim is denied. The elements of promissory estoppel trace those of promissory fraud in this context, save only that intent is not required.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. 136) is DENIED. ACP's motions for summary judgment (Dkt. 142, 148) are DENIED, except with respect to the alleged "control" promise, as to which partial summary judgment in favor of ACP is GRANTED.

**IT IS SO ORDERED.**

Dated: May 22, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge